Hello. May it please the Court, I'm Charlotte Cassidy, and I'm appearing on behalf of J. H. and D. H., the parents and guardians of P. H. I would like to reserve five minutes for rebuttal. I have three primary points to make today. First, Judge Becker's decision met all the criteria for particular deference under this Court's standard of review. Second, Judge Becker's credibility determinations underpinned the rulings the Federal Court reversed. Third, ordering recoupment of reimbursement is inconsistent with the Congressional intent in IDEA. My first point needs little discussion. Even the District Court acknowledged by words, not by actions, that Judge Becker's credibility determinations were due deference. As to my second point, that the Federal Court could not rule as she did and defer to the Administrative Court's credibility determinations, I turn first to the Federal Court's Rachel H. based reversal. The witnesses who Judge Becker found most credible, Drs. Osterling and Jones, C. B. C., and Banz, all testified residential placement was necessary for P. H. to learn. Because this made residential placement the only appropriate placement for P. H., Judge Becker did not need to further consider Rachel H. factors, but de facto, she did. Concerning P. H.'s receipt of academic benefit in the school district's program, the first Rachel H. factor, Dr. Jones testified after extensive review of past IEPs that P. H. had not made academic progress over many years. Dr. Osterling testified that lack of foundational learning skills drove P. H.'s school refusal. As to P. H.'s receipt of non-academic benefits from interacting with his peers, the effect of his presence and the effect of his teacher and other children in the classroom, the second and third Rachel H. factors, the Federal Court referred to P. H. interacting with other children, having two friends, and disrupting the class infrequently. However, extrinsic facts identified by the ALJ, such as ABC data, emails from the school district, etc., show P. H.'s interactions with classmates consisted largely of assaulting them. Classroom disturbances were frequent and severe. P. H. assaulted teachers trying to teach, threw things around the classroom, and forced entire classrooms to be cleared by masturbating in front of his classmates. The fourth factor in Rachel H. is the cost to mainstream the student, not the cost of the private school, as the Federal Court mistakenly believed. Notwithstanding, Judge Becker asked many questions about the cost of P. H.'s residential school and noted it was on the list of schools approved by the State of Washington for delivery of special education. Could I, as I understand your argument, even though the ALJ actually didn't, I don't think she cited a Rachel H. She did not. In her decision. Your whole point is that if you look carefully at the record, everything that one would need to consider the Rachel H. factors is there. Yes. And also, Your Honor, to recap, you often don't see Rachel H. discussed in residential placement cases because the standard for residential placement is higher than for other kinds of educational placement. So you have to determine that it's necessary. And under IDEA, if a case is... Rachel H. is a little bit different. It arose in the context of more of a mainstreaming kind of issue. Yes, it does. And there is no mainstreaming issue between an appropriate and an inappropriate placement. It only comes up when you're looking at two appropriate placements. So if residential was appropriate and the school districts was not appropriate, then mainstreaming doesn't really come up as an issue. Could I direct you to a couple of other issues? Sure. Yeah. Yeah. So the district court found the two factual findings by the ALJ were not supported by the evidence. Is that right? That's correct. What's your response to that? Yes. Well, one of her findings was that the ALJ believed that the district's forensic witness, Alison Brooks, had agreed that the BIP was not appropriate. And if you read it carefully, and this is discussed in my brief, the ALJ banker clearly knew that Dr. Brooks, and said several times, thought the BIP was appropriate. What she said was in the situation that Dr. Brooks had described for an IEP to not... for a BIP to not appropriate, which would be, you know, school districts, which would be the failure of the interim steps, and which would also be just a complete deterioration of behavior in the home. Judge Becker applied the criteria to Brooks' name, to her own factual findings. The second is, I mean, frankly, Judge Becker had more education, had expertise in educational matters, and the district court equated the dates on a document with the date that it was implemented, and believed that Judge Becker believed that. And that's discussed in my case. And educational records bear different dates. I mean, it could be the date of the PWN or the date of implementation. There's one other, Judge Piazza, I don't know if you want to get to all of it. What was the date in April when it was... April was the date of the document. Implementation began on May 25th. So let me ask you this. Why did the parents, shortly after that, move the child to the residential school? Because... A short period of time, right? Well, it was a short period of time that the BIP was failing. But it was not a short period of time in which the BIPs, the provisions, the targets of the BIP... You mean the VIP? I mean, you have your own... Yeah, I'm calling it a BIP. Exactly. You have your own lingo. Yeah, yeah, the VIP, Behavior Intervention Plan. Yes. But in terms of the components of the BIP, those had been trialed. I mean, Dr. Osterling and Dr. Jones, who Judge Becker found more credible, both testified that, and it sort of makes sense practically, that the behaviors, the aggressive behaviors, supported the school refusal. And those had been trialed throughout the fourth grade year, the exact same one, physical escalation. And they had been trialing BIPs for years, trying to target physical aggression by pH. I mean, you know, Montessori school, he had to have an A because of... Or not Montessori school, pardon me, preschool, because of, you know, behaviors. Also, I think that both Dr. Osterling and Dr. Jones emphasized that a BIP is based on a functional behavioral analysis, or FBA. And essentially, they both felt that the district did not go far enough back to understand all the interventions that had been trialed or that had been used unsuccessfully with pH. So, for example, you know, the one in question, the BIP in question had been in operation one element since the beginning of the year, the physical aggression, another, you know, in effect at a later point. But the point is that the school district only looked at one year of data. They only looked at the fourth grade. This student had behavior issues for years, and that's discussed in my brief. Another issue is Christopher Jones, who again Becker found credible, testified that the strategies in the BIP had also been in place for a long time. In other words, they started sending Graydon Agar, who was not Graydon Agar, sorry, Your Honor, they started sending Darian Higgins, who was not a BT, I mean, you know, but they started sending him to the home right after the March IEP meeting. And so it was really in effect for a long time. Let me ask you this. In that respect. Why was not, or maybe you don't know, but can you give me any ideas to why Rachel H. was not discussed by the ALJ? ALJ was a very careful business, so I mean, it surprised me that Rachel H. was not mentioned. Do you have any, was Rachel H. not argued to the ALJ? Your Honor, I'm trying to recall about that, but it may not have been, well, it was argued in the sense that we argued that residential was the least restrictive environment. No, no, no, I mean Rachel H. by name. Was Rachel H. by name argued to the ALJ? I hate to say I can't answer that question, Your Honor, but I really cannot. I think. Were you participating in those prior proceedings? I was, Your Honor. I briefed to them. But I mean, a long time ago. Because it surprised me that if it had been briefed that the ALJ, who appears to be very careful, very capable, didn't even mention it. Well, I can answer that, Your Honor. Again, I cannot emphasize enough, well, first of all, in my brief, I did lay out how she basically went through the process involved in Rachel H. No, I totally get that. But also, Your Honor, again, I cannot emphasize enough that in a residential, once you decide that one placement is appropriate, in other words, it will meet the kid's needs educationally, and another placement, in this case, the school district's placement, and placement is a term of art, their program, their placement. Once you determine that, you don't really have to look at whether or not the school district's program is the least restrictive environment because it doesn't matter. It won't meet the kid's needs. I don't need to hear all that. I was just wondering if it had been argued previously to the ALJ, and you're not sure. Okay. Well, I believe it was argued. By name was my question. By name, no. That's my question. Would there be any objections to just remanding to the ALJ for this type of more formal consideration of the Rachel H. Fackers? We have no objection to remanding it to the administrative court. Is there any need? Meaning, the factual findings are here. I don't think she's going to tell us anything that we don't already know in terms of what happened. I agree, Judge Fletcher, and I'll also add that I did cite one or two cases that talked about how a court is not even required to specifically reference Rachel H. as long as the factors are considered. I will also say that I think our review of the legal conclusions of the ALJ are de novo, meaning, so if the application of Rachel H. is the issue, that's a legal issue, we can do that de novo. I don't think we need to send it back so that we then defer or not defer. Yes. Thank you. Do you want to reserve the rest of your time? How much time do I have left? You have 2 minutes and 40 seconds. Okay. Let me hang on a minute, Your Honor. I cannot remember, Judge Bumate, is 2 minutes 27 seconds the time for my 10 minutes, or is it? You have 10 minutes total, which includes your rebuttal. I'm going to stop asking you questions about the clock. Okay. Also, as I said, you've actually covered a lot of, your questions have covered a lot of what I wanted to talk about. I would just say as to my... This is eating into your rebuttal time. I don't know if you understand. That's eating into my rebuttal time. Yes. You have 10 minutes total, including your rebuttal. Okay. I will skip it then. Thank you, Judge Bumate. Good morning, Your Honors. May it please the court. My name is Sam Chalfant here on behalf of Seattle Public Schools. I'd like to begin by addressing the central issue in this case, which is whether the school district's response to the student's school refusal in the spring of 2022 was appropriate under the IDA. And I think that the most critical point to beginning that analysis is recognizing the limited timeframe that was involved. The student first began refusing to attend school in March, and the school year ended in mid-June. So we're talking about a three and a half month period of time that's at issue. During that compressed timeframe, the record shows that the district promptly responded to the student's school... Tell me when the student was in fourth grade or third grade. The... This is the spring of 2022, so I believe that is fourth grade. So you're talking about the very end of the time that he was in Seattle Public Schools? That's correct. Okay. That's correct. So upon learning that the student was refusing to attend school in March of 2022, the district promptly held an IEP team meeting. At that meeting, the team offered parents immediate interventions to address the school refusal behavior, which included offering to conduct a functional behavior assessment and to conduct or to develop a behavior intervention plan. At that point... Just to... I mean, those are fancy words, but practically, what did that mean? Yeah, that is the best way under the IDA to address a behavior. In this case, a behavior of school refusal. And so the process of an FBA, which is an evaluation under the IDA, is to have the opportunity to observe the behavior, to apply different standardized tests to understand the behavior. And in this case, it ultimately included interviewing the parents to also understand and have input. And that's critically important when we're talking about behavior that's occurring in the student's home. As the record indicates... Had the parents ever brought that to the school... to the district's attention? I'm sorry, brought what? Had they brought the school refusal problem... The parents notified... ...to the school? Did they bring it to the school's attention? The parents notified the school district, I believe, on March 2nd of 2022... They just discovered that he was having refusal issues. That was the first day that the student refused to attend school. If you may recall from the record, in the fall of that school year, around November and December of 2021, there were three or four days where the student chose not to get on the bus. The parent informed the teacher of that, but she theorized the student didn't want to get on the bus because he wanted to ride in a carpool with his older brother. And so she did that. So the teacher was not aware at that time that it was a school refusal behavior. And so upon learning of the actual school refusal in March, the team came together immediately, offered these interventions, and at that point, the parents declined those interventions. So what do you... The ALJ found, I'm just reading from ER 72, the BIP did not contain any interventions that the parents and their private therapists had not already implemented. In other words, according to the ALJ, nothing new here in terms of what's being proposed as a treatment or a response. How do you respond to that statement? The ALJ is incorrect in multiple ways. The parents argued that the student had... that the behavior interventions had already been applied through CRISI behavioral consulting, which as you will recall from the brief, CRISI behavioral consulting only served 10% of the actual... I'm sorry, that's jargon. What are you talking about? What kind of consulting is this? Thank you. In the fall of 2021, the student had an outside ABA provider that parents were utilizing named CRISI behavioral consulting. That intervention... Oh, I see. That was the name of the... That's correct. That group, as the record shows, completely failed to serve the student. So the reliance by the parents on that service is not applicable because they only provided 10% of the overall services that were required. The other component that's really important to recognize is that the two BIPs at issue are very distinct. We had a behavior intervention plan that addresses the student's assaultive or aggressive behavior. That was designed to sustain appropriate behavior over time through different reinforcements. In contrast... And when was that BIP, I don't know what correct word to use, adopted or implemented? That BIP was adopted and implemented beginning in October of 2021. And that again was focusing on trying to reduce the frequency of students' aggressive behavior in the classroom. Was that BIP adopted in connection with an IEP? By Washington law, any BIP is automatically part of the IEP. So the student... Well, I understand that. But my question is, when was it adopted in relation to the IEP at the same time or in steps? I think, sorry, I spoke over you and I think I missed part of your question. But there was an IEP already in place that was running in October of 2021. Then the team completed an FBA and developed that BIP and adopted that BIP in October of 2021. And that became part of the IEP?  Okay. And then there was, that IEP continued. And as the record shows, it was modified again in May of 2025. So the ALJ found that BIP to be inappropriate or not sufficient, correct? And one of the arguments you're saying is that the ALJ should have focused on the IEP, but if it's automatically incorporated into IEP and if the BIP is inappropriate, why wouldn't that automatically make the IEP inappropriate? So our argument is twofold there. Our first argument is that the BIP was not inappropriate. And the... That's a high deference standard you have to overcome, I assume. Well, I believe, Judge, that is a de novo standard because that's a determination of law. And so the question is whether that BIP satisfied the IDEA. And as we've identified, the BIP agreed to by both parents' expert, Dr. Jones, and the district's expert was evidence-based, utilized the appropriate standards of behavioral intervention, and met all standards applicable under the IDEA.  And so the district maintains... So that we disagree and we think that the BIP, that the ALJ properly found the BIP inappropriate, then why doesn't that automatically prove the IEP inappropriate? Well, this becomes the second error that the ALJ made, which is that the ALJ found that the IEP was appropriate. And so she found the IEP was appropriate, yet the BIP was inappropriate. And those two things can't coexist. Temporarily, they were different times, right? So couldn't the IEP been appropriate... It was earlier in that year, in that school year, I think, right? And it was in the fall. The IEP is in place for the entire year. And so the IEP that was at issue at this stage of the ALJ's analysis was the March of 2022 IEP. She found that that IEP was appropriate. She found that the district did not violate the IDEA in regard to that IEP. At the same time, she found that the BIP, which by law is part of the IEP, was inappropriate. The district's position is that that is untenable. One of the key elements to recognizing that, that's not just a legal technicality, but the IEP provides the actual service minutes that implement the BIP. The BIP contains no service minutes. It doesn't assign staff to do anything. The ALJ found that that BIP was inappropriate because it was not applied in the mornings for a long enough duration. The time that the BIP was applied in the mornings was governed by the IEP, which she found appropriate. And so those two just can't... You could see how, you know, overall that it works, but not that specific part of it. I agree there's tension in her decision, and that's why we believe it's legally incorrect. But again, I draw you back to, I think it's really critical to assess how she came to the conclusion that the BIP was inappropriate. And we believe the record simply doesn't support that. I want to make sure I understand one thing about the IEP. So the IEP identifies, you know, what the issues are with the child, and then it proposes educational goals for achievement, correct? Correct. And then, if the child, I guess, has some sort of emotional or physical issue, they identify ways of dealing with that to ensure that the child receives the achievement or attainment of the educational goal. Is that correct? And that you're referring to the BIP? The BIP and the BAP. Close, close. So the IEP also includes behavioral components. So for instance, this student's IEP had specific goals around behavior. And so it addressed those. It allocated service minutes to address those. And as I mentioned, the IEP team specifically amended that IEP in March 24th to include service minutes dedicated towards addressing the student's school refusal. The BIP is designed to inform staff of the specific interventions they should use to achieve the goals. Okay, so then in May, as Judge Blumenthal was saying, with the adoption of a BAP and a BIP, that essentially amended the IEP? Yes, correct. That becomes part of the IEP. And again... This is what I don't understand. If that's the case, you know, why isn't the ALJ just simply just saying, you know, this was so critical to the achievement of the educational goals, that it's just inadequate? Doesn't do the trick. The ALJ could have ruled that, but she did not. But that's essentially what she did. I respectfully disagree because she... Let me ask you this. In our independent de novo review, could we conclude that? I think there is one potential problem on the technicality elements, and then there's a substantive problem. But on the technical application of the law, the ALJ concluded that the district's IEP did not deny FAPE. The parents never appealed that issue. The bigger piece, though, that I want to emphasize is that in order to reach that conclusion, you would have to determine that the BIP was inappropriate. And the district's position is that there is no evidence to support that. Both experts testified that that BIP was appropriate. It used best practices. Dr. Jones said he was impressed by it. Let me ask you this. Let's get back to what Judge Fletcher was talking about, which is our standard of review. You know, when you look at... As I understand it, our review is de novo. But we can't just ignore what the ALJ did. And here the ALJ... And our case law acknowledges this. You know, we're supposed to give it due regard. Given the thoroughness and the completeness of the ALJ's decision. And, you know, I can't tell you that we see these cases all the time. But the ones that I do see, it's rare that you see an 85-page decision by the ALJ that's thorough following... What was this, a 10-day hearing? I believe nine. Nine-day hearing with experts on each side. And the ALJ in a position to decide, you know, to take all this into consideration, to come up with a conclusion that's pretty... You don't see that a lot. I agree the decision was long. But that does not change that the ALJ made multiple factual errors and inappropriately applied the law. And that's the critical element here. I want to just emphasize again on the BIP. The evidence showed that the students' attendance at school improved while the BIP was implemented during the brief period of time. In addition, I... Wait a minute. Improved in what sense? There were the four days when the student went to school. Otherwise, the student refused. That's correct. So we've got to... How long was that period of the implementation? It's only 16 days before the parents residentially placed the student. No, no, no. But the school year lasted longer than that. The school year did last longer than that. The student began refusing to attend school in March. But there was no BIP in place. There were no... Contrary to what parents' argument just was, there were no interventions that were reasonably akin to the BIP that were occurring prior to it being implemented. As the record shows, the behavioral aid was only going to the outside of the house for all of March. Then the behavioral aid entered the house in April. But the student's room was in his basement. And the IEP team made an informed decision that it was not safe or reasonable to send a behavior aid into the student's most personal space without having had an FBA to determine whether that would actually elicit more aggressive behavior from the student. I also want to just emphasize one other element of the BIP's appropriateness in the data that supports that. Before you get... Yes. Is that... Whether or not the BIP was working, is that a factual question that we have to defer to ALJ? Or is that something we could review de novo? I believe that's de novo review because you're determining as a matter of law whether the BIP is appropriate. Whether it worked or not seems a little different than whether or not it's appropriate, right? Well... Or it's a... Right? So... Or like a factual matter. I believe the factual matter is determining the actual facts around what was happening with the BIP. And those are in the record, right? So we have the actual data on the students in school. We're at a 16 days. 12% going to 25% attendance rate. The other one, though, that I do encourage the court to review is the data taken by the parents themselves, their self-report. That's in the record at ER 1403 through 1430. The parents took data prior to the BIP's implementation in May and then to the end of the school year. If you may recall from the record, the BIP's first goal was the student getting dressed before school. In those days prior to the BIP being implemented, he did that, I believe, on two out of 12 days. Once the BIP was implemented, he did it on 12 out of 16. And so as the record shows and as the experts testified, it is a slow behavioral shaping process where you're moving the student progressively towards school attendance. So his school attendance went up and his steps towards attending school also improved. And that's only in 16 days. Okay, I know that some of your objections are factual, but the legal ones all seem to be somewhat formalistic about, you know, whether or not she evaluated the IEP versus the BIP and whether or not all the HLH factors. What would be your objection to just remanding it to the ALJ so that it could be done more formally in compliance with the law? The district's objection to that would be that is what is on appeal is the district court's decision and the district court appropriately did all those things and reached the correct conclusion. And so I don't believe that it'd be appropriate to sidestep the district court's decision and send it back to the ALJ. What if we disagree with the district court's finding? For example, that sentence that the district judge relies on seems to me the district judge inappropriately relied upon. Can we direct the district court to send it back to the ALJ? I'm sorry, could you clarify which sentence? It was discussed in the previous argument. Are you talking about the testimony of Dr. Brooks? Yes, yes. Thank you. The district's position is that that was not inappropriately, that the district court correctly found that the ALJ inappropriately used Dr. Brooks's testimony to say that the bid was inappropriate. And so what if I disagree with the district judge, which I do? Okay. That is to say, what I'm asking is, should we be able to direct the district judge simply to send it to the ALJ? I understand your point that we have to send it back to the district court. I get that. I think you have the authority to do that. Okay, okay. Thank you, counsel. Thank you. First thing I want to say about this is there was conflicting testimony at hearing. Judge Becker saw the witnesses, heard it, and resolved those credibility determinations. And they don't need to be revisited now. But I am going to deal with some of these facts. First of all, the definition of school refusal by the expert that Allison Brooks relied on, a gentleman named Kearney, he defines, and it's in my brief, he decided to find school refusal much more broadly than when the student doesn't go to school. So did Dr. Jones. So did Dr. Osterling. In fact, in the fall and early winter of 21 and 22, the student was fighting with his parents to go to school, about going to school. And for example, he assaulted his mother in the car when she was driving him to school and had to be taken to Children's Hospital. The expert said, this counts as school refusal. And when you look at it that way, it goes a lot farther back. As far as the notification on March 2nd, where Mr. Chalfant said the parents started refusing, refused to accept interventions, Judge Becker specifically found that was not true. In fact, their own staff admitted about that IEP meeting that the parents did not reject it. Phyllis Campano said it was an auto, this classroom teacher, an auto-population on the IEP. So they did not decline interventions. I should also just mention that the judge did find that the IEP was inappropriate. She found it was inappropriate as of the end of the school year. Under IDEA's reimbursement notification statute, and the slide is in my brief, that is the test for whether reimbursement is awarded. And whether, if a school district's IEP is inappropriate as of the time the student leaves the school district, then it is a denial of faith if they give notification. And these parents gave notification two times. District had 10 days to try to correct its program. That's the policy. And it did not do that. You have to ask yourself, why did it not offer an IEP? Why did it not implement an IEP until May 28th? Why did it not, even the so-called supervisor, and their ABA program was completely out of compliance with Washington regulations. But you have to ask yourself, why did Kevin Bascom of Rooks Powers not even show up to observe the student until the day that the IEP, until May 28th, or May 25th, the day they claimed the IEP was implemented. That was the first day he was even there to observe the student. And he was supposed to be their big guy on the ground developing this program. Again, I would just say, Your Honor, as one final point, that the, they mentioned that CB staff could not keep him safe. I want to point out that CB staff, or they didn't work with him very long, CB staff couldn't deliver the minutes. They testified to this because he was so violent that it required such a high level of supervisory staff that it was taking up all the time of the person who owned CBC, and that, in fact, she was worried about her staff getting hurt. Similarly, and you have to ask yourself, the district's program did not even include... So, Counselor, you're two minutes over your time, so if you want to wrap up. I didn't. That's in negative time. Very well. Thank you, Your Honor. I appreciate your time on all of this. Thank you, Counsel. Thank you both. This case is submitted.
judges: FLETCHER, PAEZ, BUMATAY